**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

EMMITT FORD,  :

                Plaintiff,

-vs-

BAYER CORPORATION, *et al.*,

                Defendant.  :

Case No. 3:10-cv-018

District Judge Timothy S. Black
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

This case is before the Court on Defendants' Motion for Summary Judgment, (Doc. 18), and Plaintiff's Motion for Judgment on the Administrative Record. (Doc. 19). The parties have fully briefed the issues, (Doc. 18, 19, 20, 21), and the matter is ripe for Report and Recommendations.

Plaintiff Emmitt Ford filed this action against Defendants Bayer Corporation ("Bayer") and Bayer Corporation Welfare Benefits Plan ("the Plan") pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") alleging that Bayer had wrongfully terminated his retiree medical coverage due to him pursuant to the Plan. (Doc. 1; 16).

The parties generally agree to the background facts which are gleaned primarily from the administrative record as well as from the Amended Complaint.

Mr. Ford worked for Aventis Crop Science as a sales representative from 1982 until 2003. Administrative Record ("AR") at 157 (Doc. 11, PAGEID#: 185). In 2003, Bayer acquired Aventis through merger and Mr. Ford's position was eliminated as a result of the merger. Am

Comp. at ¶ 9 (Doc. 16, PAGEID#: 235). However, Mr. Ford remained eligible to participate in a retiree group medical program offered under the Plan for retirees less than sixty-five years of age. AR at 157 (Doc. 11, PAGEID#: 185). Mr. Ford enrolled in the retiree medical program in 2005. *Id.*

After the merger with Aventis, Bayer was both the Plan sponsor and administrator. AR at 8 (Doc. 11, PAGEID#: 36). Mr. Ford was a plan participant. *Id.*

The Plan reads in part:

> Article IX.  Miscellaneous Provisions
>
> ...
>
> 9.3 Administration.  The Company shall be responsible for the administration of the Plain.  The Company shall have all such powers as may be necessary to carry out the provisions hereof and may, from time to time, establish rules for the administration of the Plan and transaction of the Plan's business.  In making any such determination or rule, the Company shall pursue uniform policies as from time to time established by it and shall not discriminate in favor of or against any Participant.  The Company shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plan including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plan.  The Company shall have the exclusive discretionary right to interpret the terms and provisions of the Plain and to determine any and all questions arising under the Plan or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision.  The Company shall make, or cause to be made, all reports or other filings necessary to meet both the reporting and disclosure requirements and other filing requirements of the Act which are the responsibility of "plan administrators" under [ERISA].  To the extent permitted by law, all findings of fact, determinations, interpretations, and decisions of the Company or its delegee shall be conclusive and binding upon all persons having or claiming to have any interest or right under the Plan.

>...
>
>9.14 <u>Conversion and Continuation Privileges</u>.  The Company, in its discretion, may adopt rules permitting Participants whose employment terminates to convert their coverage hereunder to individual health care insurance or to maintain coverage under the Plan.  The conversion shall be governed by such terms, including provisions regarding benefits and premiums, as the Company shall select.
>
>...

AR at 18, 20 (Doc. 11, PAGEID#: 46, 48).

The Summary Plan Description ("SDP") provides that once a participant elects to receive retiree medical coverage and that coverage "**is cancelled for any reason, it cannot be reinstated.**"  AR at 96 (Doc. 11, PAGEID#: 124)(bold in original).

>In a document dated June 28, 2005, sent to Mr. Ford, Bayer advised:
>
>What's Changing
>Drop Process Revised
>Bayer has reviewed the way it has managed late payments.  Your payment must be received and posted by the deadline shown on your billing notice to avoid losing coverage.  If your payment is late, all coverages for which you are billed will be dropped retroactive to your past paid-through date.
>
>Keep in mind you will be notified only once that your payment is overdue.  For example: If your bill is mailed on June 10 and no payment is received by July 10, you will be sent a billing notice which includes the minimum payment amount, paid-through date information, and the date your coverage will be dropped if payment is not received.
>...

AR at 160 (Doc. 16, PAGEID#: 188).

On November 10, 2005, Bayer sent to Mr. Ford an invoice in the amount of $107.64 for his December coverage premium, which was due to Bayer on or before December 1, 2005.  AR

at 171 (Doc. 16, PAGEID#: 199). Bayer did not receive a payment from Mr. Ford, so on December 10, 2005, it sent to Mr. Ford an invoice for both the December, 2005, which was now past due, and the January, 2006, premiums. *Id.* The December 10, 2005, invoice explained that if the then past due amount of $107.64 was not received by January 3, 2006, Mr. Ford's "coverage would be canceled effective November 30, 2005." AR at 171 (Doc. 16, PAGEID#: 199). Mr. Ford mailed Bayer a check for $107.64 which Bayer received on December 13, 2005, which paid for Mr. Ford's coverage from December 1-31, 2005. *Id.* However, Mr. Ford still owed the January, 2006, premium which was due to Bayer by January 3, 2006. *Id.* On January 10, 2006, Bayer mailed to Mr. Ford an invoice for both the January, 2006, premium, which was now past-due, and the February, 2006, premium. *Id.* Similar to the December 10, 2005, invoice, the January 10, 2006, invoice advised Mr. Bayer that because his previous payment had not been received by the January 10, 2006, statement date on this bill, his minimum payment of $134.46 must be received by January 31, 2006, or his coverage would be canceled effective December 31, 2005. *Id.*

Mr. Ford alleges that he sent to Bayer a payment of $268.92 by a check dated and mailed on January 27, 2006. Am. Comp at ¶ 18 (Doc. 16, PAGEID#: 237). Bayer posted Mr. Ford's check for the January and February, 2006, premiums on February 8, 2006, which, according to the January 10, 2006, invoice was more than one week late. AR at 171 (Doc. 11, PAGEID#: 199). Bayer rejected Mr. Ford's premiums as untimely and on March 8, 2006, refunded the full amount of $268.92 to Mr. Ford. AR at 166, 171 (Doc. 11, PAGEID#: 194, 199). Bayer cancelled Mr. Ford's retiree medical benefit coverage effective December 31, 2005, the last month for which Mr. Ford had paid the premium. Am. Comp. at ¶ 16 (Doc. 16, PAGEID#: 237).

On April 14, 2006, Mr. Ford requested in writing that Bayer reinstate his then

4

terminated retiree medical coverage. AR at 161-164 (Doc. 16, PAGEID#: 189-192). In support of his request, Mr. Ford wrote:

> I am appealing on the basis of financial hardship. I paid the premiums as soon as I had the money, ...
>
> My payment was late, but I did not realize that my health benefits would be cancelled permanently. ...I can understand the cancellation of coverage for the period of time that the premiums were not paid, but to permanently cancel the health benefits of a retiree that has served the company for over 20 years is not fair. ...
>
> I realize now that it was my mistake in not getting the premiums to you on time, but I am appealing to you to reinstate my health benefits base [sic] upon fairness and human compassion. ...

AR at 163; (Doc. 16, PAGEID#: 191).

In a letter dated May 10, 2006, to Mr. Ford, Bayer, through the Determination Review Team ("Review Team"), explained why it was not able to grant his request to reinstate his retiree medical coverage. AR at 168-169 (Doc. 11, PAGEID#: 196-197). Specifically, the Review Team reviewed the billing notice history related to Mr. Ford's premiums and pointed out that Mr. Ford's January and February, 2006, premiums were not received by the January 31, 2006, due date. *Id.* The Review Team also referred to the SPD which provides that once retiree medical coverage is "cancelled for any reason, it cannot be reinstated". *Id.*

On August 28, 2006, Mr. Ford appealed the Review Team's decision to Bayer's ERISA Review Committee ("the Committee"). AR at 152 (Doc. 11, PAGEID#: 180). In that letter of appeal, Mr. Ford wrote in part:

> ...
>
> ...[M]y premium was not always paid by the due date. However, the premiums were always paid by the cancellation date. In this particularly [sic] case, I got confused and thought that the

5

> cancellation date was at the end of February. I sent the payment on [sic] February on the 27th and you refunded it back to me on March 8th. I can understand that Bayer can't provide coverage if the premiums have not been paid for the period in question. I do not understand why Bayer would permanent [sic] cancel medical benefits for a retiree that has worked for the company for over 20 years to earn that benefit. ...

*Id.*

The Committee considered Mr. Ford's appeal and on January 22, 2007, it sent to Mr. Ford a letter advising him that his retiree medical coverage was not going to be reinstated because he did not timely pay the premiums. AR at 137-38 (Doc. 11, PAGEID#: 165-66). The Committee explained that:

> ...The Committee is required by law to administer the Plan in accordance with its terms. Those terms include cancellation of coverage for non payment of premiums. ... [I]n accordance with the terms of the Plan, the Committee upholds the cessation of your retiree medical benefits effective January 1, 2006.
> ...

*Id.*

This action followed when Mr. Ford filed his Complaint on January 20, 2010. (Doc. 1).

ERISA comprehensively regulates employee benefit plans. 29 U.S.C. §§ 1002, 1003. It regulates benefit plans to ensure the uniformity of decision which will assist plan administrators, fiduciaries, and participants to predict the legality of proposed actions without the necessity of reference to varying state laws. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 56 (1987).

In his concurring opinion in *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (6th Cir. 1998), which became the Court's opinion on the issue his opinion addressed, Judge Gilman ascertained that the methods used by district courts in adjudicating proceedings under 29 U.S.C.

6

§1132(a)(1)(B), to wit: bench trials on the merits under Fed.R.Civ.P. 52 and summary judgment procedures set forth in Fed.R.Civ.P. 56, are both inconsistent with the appropriate standard of review set forth by the Court in *Perry v. Simplicity Engineering,* 900 F.2d 963 (6th Cir. 1990). *Wilkins,* 150 F.3d at 617-18. Accordingly, the Court established a set of guidelines to replace summary judgment procedures for district courts to use in adjudicating ERISA recovery of benefits actions. *Id.* at 619. As to the merits of the claim, the *Wilkins* court instructed district courts to conduct a review based solely on the administrative record and render findings of fact and conclusions of law accordingly. *Id.* In doing so, the court may consider the parties' arguments concerning the proper analysis of the evidence contained in the administrative record, but it may not admit or consider any evidence not presented to the administrator except where there is a procedural challenge to the administrator's decision such as an alleged lack of due process afforded by the administrator or alleged bias on its part. *Id.*

It is by now well-established that courts review challenges to ERISA benefit determinations under the *de novo* standard unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *University Hospitals of Cleveland v. Emerson Electric Co.,* 202 F.3d 839, 844 (6th Cir. 2000), *citing, Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where an ERISA plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the plan administrator's decision to deny benefits is reviewed under the deferential arbitrary and capricious standard of review. *Shields v. Readers Digest Association, Inc.*, 331 F.3d 536 (6th Cir. 2003), *citing, Firestone, supra.* Under the deferential "arbitrary and capricious" standard, a court will uphold a benefit determination if it is "rational in light of the

plan's provisions." *University Hospitals,* 202 F.3d at 846. The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003). Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious. *University Hospitals, supra.* (citation omitted).

The parties agree that the Plan grants the Plan's administrator discretionary authority to administer the Plan, interpret the terms of the Plain, and to determine eligibility for any benefits payable under the Plan and therefore the Court must review the Committee's decision under the arbitrary and capricious standard (Doc. 18 at 5, PAGEID#: 250; Doc. 19 at 7, PAGEID#: 283).

Mr. Ford argues first that Bayer's decision was arbitrary and capricious due to its failure to consider his claim in light of the "mailbox rule". Specifically, Mr. Ford's argues that the evidence in the claim record supports an inference that he mailed a check for payment of his January, 2006, medical coverage on January 27, 2006, the same date written on his check. Mr. Ford's position is that, "Bayer's interpretation of Plan requirements for determining timely payment—that a payment is 'received' when it is posted by Bayer—may have resulted here in a termination of [his] medical benefits for reasons beyond his control, such as untimely mail delivery or untimely posting of the payment.". (Doc. 19 at 9, PAGEID#: 285).

The Sixth Circuit has explained the mailbox rule as follows:

The common law has long recognized a presumption that an item properly mailed was received by the addressee. *Hagner v. United States,* 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). The presumption arises upon *proof* that the item was properly addressed, had sufficient postage, and was deposited in the mail. *Simpson v. Jefferson Standard Life Insurance Co.,* 465 F.2d 1320, 1323 (6th Cir. 1972).

8

*In re: Yoder Co.,* 758 F.2d 1114, 1118 (6th Cir. 1985)(emphasis supplied).

First, as noted, the common law mailbox rule applies when receipt of an item is in dispute. That is not the case here—there is simply no dispute that Bayer received Mr. Ford's premium. In fact, there is no dispute that the premium was untimely. Mr. Ford acknowledged that fact in his April 14, 2006, letter to Bayer wherein he wrote, "My payment was late..." and, " I realize now that it was my mistake in not getting the premiums to you on time ...".

Second, even assuming that there was a dispute as to receipt of the premium, whether actual or timeliness, as noted above, the presumption on which Mr. Ford would rely never arises unless he proves that he mailed the premium in a timely manner. *Yoder, supra.*; *see also, Laird v. Norton Healthcare, Inc,* No. 3:08-CV-500-S, 2010 WL 411546 at *2 (W.D.Ky. Jan. 29. 2010)("[t]his presumption is not invoked lightly; it requires proof of mailing such as an independent proof of a postmark, a dated receipt, or other evidence of mailing apart from a party's own self-serving testimony."). At no time has Mr. Ford attempted to provide independent proof as to the mailing of the premium. Mr. Ford's own allegations of mailing simply would not satisfy his burden of proof for purposes of the mailbox rule[1].

Mr. Ford also argues that the Committee should have considered the applicability of the mailbox rule embedded in COBRA. However, even assuming *arguendo* that COBRA regulations are applicable to ERISA matters, and that a premium payment is "made on the date on which it is sent to the plan", 26 C.F.R. § 54.498b-8, for the same reasons given above, Mr. Ford's claim fails. Specifically, Mr. Ford has simply failed to provide any proof of mailing and he, in fact.

---

[1] It would seem that any attempt to provide the necessary proof for purposes of establishing the date of mailing would be inconsistent with Mr. Ford's acknowledgments to Bayer in April 2006 that he knew the premium was late and that it was his mistake for not getting the premium to Bayer on time.

admitted to Bayer that his premium was late and that it was his mistake for not timely getting the premium to Bayer.

This Court concludes that, under these facts, Bayer's interpretation and application of the Plan which require timely payment of premiums for continuing retiree medical benefits was not arbitrary and capricious. Accordingly, its decision to terminate Mr. Fords benefits under the Plan was not arbitrary and capricious.

It is therefore recommended that Defendants' Motion for Summary Judgment [sic], (Doc. 18), be granted and Plaintiff's Motion for Judgment on the Administrative Record, (Doc. 19), be denied.

October 15, 2010.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).